199 P.3d 155

**STATE of Idaho, Plaintiff–Respondent,**

v.

**Ronald John HUNTSMAN, Sr., Defendant–Appellant.**

Nos. 33213, 33243.

Court of Appeals of Idaho.

Dec. 2, 2008.

Review Denied Jan. 6, 2009.

Greg S. Silvey, Kuna, for appellant.

Hon. Lawrence G. Wasden, Attorney General; Lori A. Fleming, Deputy Attorney General, Boise, for respondent. Lori A. Fleming argued.

WALTERS, Judge Pro Tem.

Ronald John Huntsman, Sr., appeals from his conviction for first degree murder, using a firearm in the commission of the murder, and two counts of second degree kidnapping. We affirm.

## I.

## FACTS AND PROCEDURE

The evidence presented at trial was that in March 2005, Huntsman and Larry Hanslovan kidnapped Kyle Quinton and Becky Boden and took them to Barbara Dehl's residence, where the three bound Quinton and Boden with packing tape, beat them, and questioned them about jewelry that Dehl claimed was missing from a safe in her house. During the incident, someone implicated John Schmeichel in the theft of the jewelry. Hanslovan and Huntsman then released Quinton from the restraints and took him to find Schmeichel.

When the parties arrived at the residence where Schmeichel was staying, Hanslovan and Huntsman confronted him about the allegedly stolen property. Subsequently, Schmeichel left with them in Hanslovan's vehicle. While they were driving back to Dehl's residence, Huntsman turned around from his position in the front passenger seat and shot Schmeichel in the face with a .38 caliber revolver, killing him. When they reached Dehl's residence, Hanslovan and Huntsman enlisted Quinton's help in removing the body from the vehicle and wrapping it in trash bags and a tarp. A day or two later, Huntsman and Hanslovan drove to Elmore County where they and two other individuals dug a shallow grave and buried Schmeichel's body.

A grand jury indicted Huntsman on one count of first degree murder with a sentence enhancement for using a firearm in the commission of the murder, and two counts of kidnapping. In the same indictment, Hanslovan was charged with two counts of kidnapping with firearm enhancements, and one count of trafficking in methamphetamine, and Dehl was charged with two counts of kidnapping and one count of trafficking in methamphetamine. After the court denied the defendants' motions for separate trials, but did allow the drug charges to be severed, Huntsman and his co-defendants pled not guilty and trial was scheduled to begin on October 11, 2005.

At a hearing on September 30, 2005, Dehl and Hanslovan moved to reschedule the trial for the purposes of continuing their investigation, and they waived their speedy trial rights. The state joined in the motion, advising the court that the previous day, one of its witnesses had turned over what was believed to be the murder weapon. The state requested that the trial be rescheduled to provide the parties the opportunity to investigate and test this newly discovered evidence.

Huntsman, however, objected to the continuance and declined to waive his right to a speedy trial. The court granted the motion to continue as to Dehl and Hanslovan, but denied the state's request in regard to Huntsman, deciding that there was not good cause to continue the trial in light of Huntsman's assertion of his statutory speedy trial rights.

On October 6, the state filed a motion to dismiss the charges against Huntsman without prejudice. After a hearing, the court granted the motion. Several days later, a second indictment was filed charging Huntsman with the same charges as he had initially faced. The state then moved to consolidate his case with those of Hanslovan and Dehl. Huntsman opposed the motion, but it was granted by the court. Trial was scheduled to begin on April 10, 2006—almost six months after the second indictment had been filed.

In January 2006, Huntsman filed a motion to dismiss, claiming that his state and federal constitutional rights to a speedy trial had been intentionally violated when the prosecution dismissed and re-filed the identical charges. The district court never ruled on the motion and trial proceeded as scheduled—against Huntsman alone as his co-defendants negotiated plea bargains.

After a ten-day trial, the jury found Huntsman guilty as charged. The district court entered a judgment of conviction and imposed a unified life sentence with thirty years determinate for the first degree murder conviction and firearm enhancement, and a concurrent unified sentence of twenty years with ten years determinate for the kidnapping conviction. Huntsman now appeals.

## II.

## ANALYSIS

### A. Jurisdiction on Appeal

■ The state argues that this Court is without jurisdiction to consider Huntsman's claims that relate to the initial case that was dismissed without prejudice by the district court, because Huntsman did not file a timely notice of appeal from the order of dismissal

entered in the initial case. Specifically, the state argues that this Court cannot address Huntsman's contentions that the district court erred by granting the state's motion to dismiss, that the dismissal without prejudice resulted in a violation of his due process rights, and that the district court judge showed partiality by suggesting to the prosecution that it could simply dismiss and re-file the charges against Huntsman.

■ A question of subject matter jurisdiction is fundamental and a matter of law; it cannot be ignored when brought to our attention and should be addressed prior to considering the merits of an appeal. *State v. Kavajecz*, 139 Idaho 482, 483, 80 P.3d 1083, 1084 (2003); *State v. Savage*, 145 Idaho 756, 758, 185 P.3d 268, 270 (Ct.App.2008).

Idaho Appellate Rule 14 requires that an appeal as a matter of right from a judgment or final order of the district court in any criminal action must be filed within forty-two days from the filing of the order being appealed. Pursuant to I.A.R. 11(c)(3), an order granting a motion to dismiss an information is an order appealable as a matter of right. In addition, I.A.R. 11(c)(4) provides that "[a]ny order or judgment, whenever entered and however denominated, terminating a criminal action" is appealable as a matter of right. A timely notice of appeal is a prerequisite for an appellate court to have jurisdiction to review a case. I.A.R. 21; *State v. Payan*, 128 Idaho 866, 867, 920 P.2d 82, 83 (Ct.App.1996).

Here, acting on the state's motion, the district court dismissed the prosecution against Huntsman without prejudice in case number H0500555 on October 7, 2005, but Huntsman did not file a notice of appeal until July 5, 2006, after the second case had been adjudicated. Huntsman initially argues that the order dismissing the charges did not dismiss an information as encompassed by I.A.R. 11(c)(3) since he was charged by indictment and that under I.A.R. 11(c)(4), the dismissal was not an order "terminating" the criminal action against him since the charges were re-filed. Specifically, he argues that the initial case did not terminate upon the grant of the state's motion to dismiss because it was "at least in part resurrected and be-

came part of the second [case]." Huntsman offers no authority for this assertion, however, and we conclude that it is simply not tenable. Common sense dictates that the granting of a motion to dismiss does, indeed, "terminate" a criminal action regardless of the prosecution's subjective intent to re-file the charges—in such a circumstance a defendant is no longer facing charges, is no longer in "jeopardy," and must be freed from incarceration. That such a proceeding is "resurrected" if identical charges are filed does not find any support in the rules, nor in our caselaw, and we will not read such an unsupported assertion into the appellate rules.

Huntsman also argues that even assuming the dismissal was a final appealable order, "it seems questionable that the defendant is a party aggrieved by the order" who may appeal the order in compliance with I.A.R. 4.[1] However, the Supreme Court's holding in *State v. Manley*, 142 Idaho 338, 127 P.3d 954 (2005), indicates otherwise, because Huntsman was an aggrieved party by virtue of the fact that the initial case was dismissed *without prejudice*. In *Manley*, after a mistrial was ordered in a second degree murder prosecution based on the trial court's conclusion that the defendant's counsel was providing incompetent representation and was unfit to continue, the defendant moved to dismiss the murder charge with prejudice, claiming that the mistrial order was not justified and that any retrial would be barred by the constitutional guarantee against double jeopardy. The district court denied the motion—as well as the subsequent motion to dismiss with prejudice filed by the state—and set a new trial date. A week before the second trial was to begin, the state again moved to dismiss with prejudice, as new lab results had weakened the state's case against the defendant. The court granted the dismissal motion, but did so without prejudice. The defendant appealed, arguing that the charges should have been dismissed with prejudice given the double jeopardy issue. The Supreme Court held that the dismissal was appealable, noting that if the state chose to prosecute the defendant again—as it had every right to do—the defendant will be "rele-

gated to seeking a permissive interlocutory appeal ... before trial" in order to get a final decision on the double jeopardy defense, and that if such an appeal were not granted, the defendant would be "forced to sit through another trial, with all its attendant anxiety, expense, embarrassment, and then appeal the double jeopardy issue if convicted." *Id.* at 343, 127 P.3d at 959. Thus, in essence, although the murder charge had been dismissed against him, the defendant was an aggrieved party because he could still be put "in jeopardy" since the dismissal was granted without prejudice.

In this case, Huntsman was an aggrieved party even though the charges against him had been dismissed because the district court had done so without prejudice. This left Huntsman open to facing the same charges again—a situation that all parties knew was certain to happen given that the prosecution's explicit intent to re-file the charges. Accordingly, where the court's grant of the state's motion to dismiss had the effect of terminating the criminal action against Huntsman in case number H0500555—and thus was an appealable order under I.A.R. 11(c)(4)—and Huntsman was aggrieved by the dismissal without prejudice, we conclude that Huntsman's failure to appeal the dismissal and the judge's actions in the initial case within forty-two days of the dismissal of that case or to pursue a motion to dismiss in the second case resulted in his appellate rights concerning case number H0500555 not being preserved. As a result, we will not address the merits of his claims regarding the court's grant of the motion to dismiss without prejudice or his allegation that the trial judge improperly suggested a course of action to the prosecution.

**B. Violation of Constitutional Speedy Trial Rights**

Huntsman asserts that he did not waive his right to a speedy trial and that consequently, his speedy trial rights under both the Idaho and federal constitutions were violated by the fact that his trial did not

1. Idaho Appellate Rule 4 provides that "[a]ny party aggrieved by an appealable judgment, or-

der or decree ... may appeal such decision to the Supreme Court as provided in these rules."

proceed until over a year after he was arrested on the initial charges. The state responds by arguing that Huntsman's claim in this regard is not preserved for our review on appeal.

In January 2006, after the second indictment had been filed, Huntsman moved to dismiss the indictment, claiming that his state and federal constitutional rights to a speedy trial had been intentionally violated when the prosecution had dismissed the initial charges and refiled identical charges. Subsequently, at a hearing in March 2006 on the topic of jury selection procedures, the court acknowledged the pending motion to dismiss in the following exchange:

THE COURT: ... You also have a pending motion to dismiss, if I recall correctly.

[DEFENSE COUNSEL]: I do, Judge. I am less concerned about that, I think it's probably—

THE COURT: I think the case law is fairly clear on that, but I suspect we can take that up next Thursday, as well.

[DEFENSE COUNSEL]: I think so too. Am I simply going to be arguing this motion next week then? [referring to a different motion]

The motion to dismiss, however, was never argued to or decided by the court.[2] In his brief to this Court, Huntsman admits that "[i]t does not appear that the court ever ruled on the motion," but argues that we should address the merits of the motion since the judge had "actual knowledge of the motion" and because a trial occurred, the motion was "obviously not granted."

■ It is well settled that in order for an issue to be raised on appeal, the record must reveal an adverse ruling that forms the basis for assignment of error. *State v. Amerson*, 129 Idaho 395, 401, 925 P.2d 399, 405 (Ct.

App.1996). In *State v. Garcia*, 126 Idaho 836, 892 P.2d 903 (Ct.App.1995), this Court addressed the importance of having an adverse ruling to review in the context of an allegation of a speedy trial violation:

We note also that an alleged violation of speedy trial rights is particularly inappropriate for consideration for the first time on appeal because the appellate record, where no speedy trial challenge was raised below, is seldom adequate to permit resolution of the claim. Such a claim raises mixed questions of fact and law, and determining whether the right to a speedy trial has been infringed requires application of the balancing test enunciated in *Barker v. Wingo*, 407 U.S. 514, 530, 92 S.Ct. 2182, 2192, 33 L.Ed.2d 101, 116.... This balancing test involves consideration of the length of the delay of the trial, the reason for the delay, the defendant's diligence in asserting his right, and prejudice to the defendant. The factors to be considered in this balancing process often present factual issues, particularly with respect to the reasons for the delay and whether the defendant has suffered prejudice. If a motion for relief based on speedy trial rights was not asserted before the trial court, the State has received no opportunity to present evidence or otherwise make a record addressing those issues, and the trial court has not resolved factual issues in conducting the balancing test. Therefore, when the defendant asserts a speedy trial violation for the first time on appeal, the appellate court generally has neither factual findings of the trial court to review nor an adequate record upon which the appellate court could determine whether the *Barker v. Wingo* factors weigh in favor of the defendant or the State.

*Id.* at 838, 892 P.2d at 905 (citations omitted). *See also State v. Averett*, 142 Idaho 879, 888, 136 P.3d 350, 359 (Ct.App.2006) (declining to

---

**2.** The court specifically stated when granting the motion to dismiss the first case that it was not addressing Huntsman's allegation of a constitutional speedy trial violation:

As it related to the allegations of potential prejudice, I would simply note that questions of prejudice from a constitutional speedy trial analysis are matters that will be reserved to whatever judge makes decisions as to what likely will be a

*Barker v. Wingo*-type analysis down the road, should the State be successful in persuading either a grand jury or a magistrate that probable cause exists to believe that the defendant committed the crimes of murder and kidnapping. There is no indication in the record that the court ever revisited the issue after new charges were filed.

address a violation of speedy trial allegation as it had not been raised below). It is the appellant's burden to obtain a ruling on his motion, *State v. Barnes,* 133 Idaho 378, 384, 987 P.2d 290, 296 (1999).

Despite Huntsman's insistence that the district court impliedly denied his motion to dismiss on speedy trial grounds, we conclude the issue is not preserved for appeal. Whether speedy trial rights were violated is, as described in *Garcia,* a fact-intensive inquiry and in this case, the district court did not make the requisite factual findings, nor was the state given the opportunity to present evidence or otherwise make a record on the issue. Following our well-settled precedent, we conclude the issue was not preserved and will not address it on the merits in this appeal.

## C. Late Disclosed Witness

Huntsman contends that the district court erred in allowing two witnesses, Trina Clampitt and Steven Davis to testify at trial. The issue arose when, at a hearing on April 4, 2006—with trial scheduled to begin on April 10—the state attempted to add five witnesses to the witness list it had previously disclosed. Huntsman objected, citing the district court's order that all prospective witnesses be disclosed by March 24. After hearing argument from both parties, the court excluded the testimony of all but one—Clampitt, who was Becky Boden's mother.

The state intended to call Clampitt for her testimony that she saw an abrasion in Becky's mouth which the police had not seen soon after the kidnapping—testimony which corroborated the state's evidence that during the kidnapping, a gun had been put in Becky's mouth. The state asserted that it had disclosed Clampitt after the deadline because she and Becky had been difficult to locate and, as a result, the prosecutor had only met with her and Clampitt about a week prior, at which time Clampitt related that she had seen an abrasion in Becky's mouth immediately after the alleged kidnapping. The court concluded that it would have been impossible for the state to disclose Clampitt as a witness any earlier since the state only recently learned of her proposed testimony.

After the court excluded the other four late-disclosed witnesses, the state filed a motion for reconsideration. During a hearing on the motion, the court decided to allow trial testimony from Davis who, like Huntsman, was an inmate at the Idaho State Correctional Institution and would testify that Huntsman had made "great number of admissions to him regarding the case." The state represented that it had, prior to the discovery deadline, provided defense counsel with both Davis's name and a transcript of an interview that detectives had conducted with him. The state acknowledged that while at the time it had not specifically identified Davis as a possible witness, it had, in a previous discovery response, put Huntsman on notice that it may call any person identified in the police reports and other documents that it had provided during discovery. The state also provided notice that on April 2, 2006, Davis had disclosed to the state for the first time additional inculpatory information, specifically Davis's assertion that Huntsman had told him that he had attempted to alter the ballistics of the murder weapon by shoving a wire coat hanger down the barrel. The court granted the motion to reconsider and allowed Davis to testify, deciding that there was no demonstrable prejudice "other than Mr. Davis seems to be making it up as he goes."

█ Whether to impose a sanction for a discovery violation, and the choice of an appropriate sanction, are within the discretion of the trial court. *State v. Allen,* 145 Idaho 183, 185, 177 P.3d 397, 399 (Ct.App.2008). Where a late-disclosed witness has been allowed to testify despite an untimely disclosure, we will not reverse a conviction in the absence of a showing that the delay prejudiced the defendant's preparation or presentation of his defense. *State v. Byington,* 132 Idaho 589, 592, 977 P.2d 203, 206 (1999); *State v. Johnson,* 132 Idaho 726, 728, 979 P.2d 128, 130 (Ct.App.1999). The inquiry on appeal is whether the lateness of the disclosure so prejudiced the defendant's preparation or presentation of his defense that he was prevented from receiving his constitutionally guaranteed fair trial. *Byington,* 132 Idaho at 592, 977 P.2d at 206; *State v. Pacheco,* 134 Idaho 367, 370, 2 P.3d 752, 755

(Ct.App.2000). This ordinarily requires that the complaining party demonstrate that the late disclosure hampered his ability to meet the evidence at trial, *State v. Miller*, 133 Idaho 454, 456–57, 988 P.2d 680, 682–83 (1999); *State v. Pizzuto*, 119 Idaho 742, 751, 810 P.2d 680, 689 (1991), had a deleterious effect on his trial strategy, *United States v. Marshall*, 132 F.3d 63, 68, (D.C.Cir.1998); *United States v. Camargo–Vergara*, 57 F.3d 993, 999 (11th Cir.1995), or deprived him of the opportunity to raise a valid challenge to the admissibility of evidence. *Camargo–Vergara*, 57 F.3d at 999.

The district court here elected not to exclude the witness or impose any other sanction. Therefore, the question on appeal is whether Huntsman was so prejudiced by the state's alleged discovery violation that the trial court's refusal to exclude the witnesses as a sanction constituted an abuse of discretion.[3]

■ In regard to Clampitt, we conclude that the district court did not abuse its discretion in refusing to exclude her testimony, because Huntsman did not demonstrate actual prejudice stemming from the late disclosure. Huntsman claims on appeal that he did not have sufficient time to address Clampitt's testimony, but he has failed to articulate how he could have better addressed the evidence—even had it been disclosed earlier—that would have been more effective than the cross-examination of Clampitt that Huntsman conducted at trial as well as his argument to the jury in closing regarding the inconsistencies between Clampitt's testimony and the police report which indicated there was no observable injury to Boden's mouth. We also note that in the context of the case as a whole, whether a gun was placed in Boden's mouth during the kidnapping—and

whether Boden had a resulting abrasion—was not an essential, material issue at trial, nor was it complex.

■ We also affirm the district court's decision to admit Davis's testimony, for Huntsman demonstrated no prejudice from its admission. Huntsman acknowledges the information about Davis's knowledge had been provided to him prior to the discovery deadline. Thus, the only truly late-disclosed evidence the state was permitted to elicit from Davis was his testimony that Huntsman had told him that he had tampered with the ballistics of the murder weapon. However, despite the tardy disclosure, Huntsman had approximately two weeks before the witness was called and was able to significantly refute this testimony, engaging in an extensive cross-examination of Davis and bringing to light how his statements to law enforcement had repeatedly changed. Also, Huntsman elicited testimony from both the state's and the defendant's ballistics experts that the inside of the barrel of the weapon showed no evidence of having been tampered with.

Huntsman has not shown how his presentation to the jury would have differed in any respect or how he would have been able to conduct more effective cross-examinations of Clampitt and Davis had they been timely disclosed, and accordingly, we conclude there was no reversible error in the admission of their testimony.

**D. Idaho Rule of Evidence 615 Exclusion Order**

■ Huntsman argues that the district court erred in failing to strike the testimony of Clampitt. He also argues that, in accordance with its I.R.E. 615 exclusion order,[4]

---

**3.** Huntsman also argues that even if there is no prejudice, the witnesses should have been excluded because the late disclosure was "willful" and "intentional." *See State v. Martinez*, 137 Idaho 804, 53 P.3d 1223 (Ct.App.2002) (noting that the U.S. Supreme Court has held that in cases involving willful and intentional late disclosure, the trial court may exclude the late disclosed witness without regard to any prejudice to the other party). However, Huntsman makes no credible argument that the late disclosures in this case were "intentional." As the state points out, the mere fact that the state did not strictly com-

ply with the discovery deadlines does not establish a willful violation. There must be evidence that the late-disclosure was "motivated by a desire to obtain a tactical advantage that would minimize the effectiveness of cross-examination and the ability to adduce rebuttal evidence," *Martinez*, 137 Idaho at 807, 53 P.3d at 1226, and such a showing was not made here.

**4.** Idaho Rule of Evidence 615(a) provides that "[a]t the request of a party the court may order witnesses excluded so that they cannot hear the

the district court should have excluded the testimony of Dannice Hayden, with whom Huntsman had stayed for several days after the murder. Specifically, he argues that a discussion between the two women in the witness room during trial violated the court's exclusion orders and that the court failed to recognize the violation and thus abused its discretion in not striking and excluding their testimony, respectively.

Prior to trial, the district court entered two I.R.E. 615 exclusion orders. The first order, entered at a hearing on January 18, 2006, excluded prospective witnesses from the courtroom and stated that providing any witness with "any other description of any other witness' testimony, any notes, any synopses, any accounts of any other witness' testimony" was disallowed. The second order was entered at the pretrial conference on March 30, 2006, and again excluded prospective witnesses from the courtroom and "further direct[ed] that no prospective witness be advised of the substance of any other witness' testimony, whether that be in the form of notes, verbal accounts, transcripts or otherwise."

The situation giving rise to the issue at hand occurred in the midst of Huntsman's trial. Hayden, a state's witness waiting to testify, and Clampitt found themselves together in the witness room. Clampitt had already testified at the trial that after the kidnapping incident, her daughter had told her that a gun had been put in her mouth and that Clampitt had observed a scrape of the roof of Boden's mouth. She had also testified that she noticed that one of Boden's wrists had been bruised and swollen and that the injury still bothered Boden and she was receiving treatment for it. She further testified as to Boden's behavioral changes since the kidnapping.

In the witness room, Clampitt told Hayden that she was upset due to not being allowed to be present for her daughter's testimony, because she wanted to support her and also because she wanted to hear about everything that had happened to her. She also revealed to Hayden that during the kidnapping, her daughter had been taped at the wrist—causing injury—and that Huntsman had placed a gun in Boden's mouth and pressed it to the roof of her mouth (and that she was there to testify to that fact). Hayden later testified that Clampitt had told her Boden's first name, but that Hayden had never heard of her, nor seen her before. After this conversation, Boden herself entered the witness room, but she and Hayden did not speak.

On April 19, the state filed an affidavit of Hayden which stated that on the previous day, she had advised the prosecution that she had additional information regarding that case that she had not previously revealed to the police or the prosecution. Specifically, she averred that Huntsman had admitted to her that he had shot the decedent.[5] The affidavit also summarized her conversation with Clampitt in the witness room the day before and stated that having seen Boden and realizing how young she was (she had just turned eighteen), affected her decision to tell the truth regarding Huntsman's statements to her. She also averred that "recent positive changes" in her life, including ceasing drug use and attending church, influenced her decision to come forward with the information.

Faced with this information, prior to allowing Hayden to testify the court held a hearing on the matter during which both Clampitt and Hayden were put under oath and questioned as to their conversation. Hayden testified as to the content of the conversation, and when asked about her statement in the affidavit regarding her decision to tell the truth after realizing how young Boden was, she testified that that realization—in concert with other personal reasons—did affect her decision to come forward with what she indicated was the truth.

Clampitt then testified at the hearing, giving her version of the conversation with Hay-

---

testimony of other witnesses, and it may make the order of its own motion...."

**5.** Prior to her decision to "tell the truth," the substance of Hayden's testimony was to be sim-

ply that Huntsman had stayed with her for a few days after the murder and that she had lent him her car.

den which was mainly that she had expressed her frustration at not being able to support her daughter during Boden's testimony, but denying that she had wanted to be present to learn what happened to her daughter. She stated that Hayden had told her that she knew Huntsman, had allowed him to stay at her home, and that she had been the one to turn him in. Clampitt testified that she had told Hayden that she was there to testify about a gun being put in Boden's mouth during the kidnapping, but had not told her whether Boden had been injured.

At the close of testimony, Huntsman requested that the trial testimony of Clampitt be stricken and that Hayden not be allowed to testify. The state objected. The district court denied Huntsman's request, deciding that "the conduct [was] not directly violative of the court's order" but allowing examination in the jury's presence of both witnesses in regard to the incident.

When testifying at trial, Hayden stated, among other things, that Huntsman had told her shortly after the incident that he had shot the decedent in the head and that he needed to get rid of clothing and a pair of shoes. She testified that a few hours after hearing this information she had called the Crime Stoppers tip line anonymously and turned Huntsman in. She admitted that when she was interviewed at length by the police, she never told them that Huntsman had admitted to shooting Schmeichel and needed to dispose of certain items. She also testified that she had decided to tell the truth, just recently having changed her life. On cross-examination, she admitted that after meeting with another state's witness outside the courtroom, she had decided to give this new testimony and that the meeting had helped her in deciding whether to tell the truth.

The granting or denying of a request for exclusion under I.R.E. 615 is a discretionary decision of the trial court. *State v. Slawson*, 124 Idaho 753, 755, 864 P.2d 199, 201 (Ct.App.1993). The appropriate remedy for a breach of an exclusion order is also committed to the sound discretion of the trial court. *State v. Christensen*, 100 Idaho 631, 603 P.2d 586 (1979); *Slawson*, 124 Idaho at 755, 864 P.2d at 201. In exercising its discretion, the trial court ordinarily should not exclude witnesses without a demonstration of probable prejudice. *Slawson*, 124 Idaho at 755, 864 P.2d at 201. Moreover, a failure of the trial judge to order a mistrial when witnesses who have violated sequestration orders nevertheless testify will not justify reversal on appeal absent a showing of prejudice sufficient to constitute an abuse of discretion. *Id.*

Here, even assuming, without deciding, that the witness's actions violated the court's orders, we conclude that the trial court's failure to exclude their testimony was not erroneous, because Huntsman has failed to show the requisite prejudice. As the state points out, the purpose of a Rule 615 exclusion order is to reduce the possibility of witnesses shaping their testimony to conform to or to rebut the prior testimony of other witnesses. *See State v. Ralls*, 111 Idaho 485, 487, 725 P.2d 190, 192 (Ct.App.1986). In this case, there is no evidence that Hayden changed her testimony to conform to or rebut Clampitt's previous testimony. In point of fact, the subject matter of each woman's testimony was distinctly unrelated—with Clampitt testifying as to what happened to Boden during the kidnapping and Hayden testifying as to Huntsman's statements to her regarding the murder. Clearly, the danger Rule 615 is meant to prevent was not implicated. We also conclude that Hayden's decision to change her testimony after the conversation with Clampitt did not require exclusion of their testimony as Hayden's decision was significantly attenuated from her conversation with Clampitt—in fact, she testified that it was not her conversation with Clampitt that spurred her towards telling the "truth," but the realization of how young Boden was, as well as other personal reasons unrelated to Clampitt. Given these circumstances, we conclude there has not been a showing of prejudice and that the district court was not required to exclude either woman's testimony.

### E. Mistrial

Huntsman argues that the court also erred in refusing to grant his motion for

a mistrial after Steven Davis made the jury aware that Huntsman was being represented by a public defender. The question on appeal when we review the denial of a motion for a mistrial is not whether the trial judge reasonably exercised his discretion in light of circumstances existing when the mistrial motion was made. *State v. Sandoval–Tena*, 138 Idaho 908, 912, 71 P.3d 1055, 1059 (2003); *State v. Shepherd*, 124 Idaho 54, 57, 855 P.2d 891, 894 (Ct.App.1993). Rather, the question must be whether the event which precipitated the motion for mistrial represented reversible error when viewed in the context of the full record. *Id.* Thus, where a motion for mistrial has been denied in a criminal case, the "abuse of discretion" standard is a misnomer; the standard, more accurately stated, is one of reversible error. *Id.* Our focus is upon the continuing impact on the trial of the incident that triggered the mistrial motion. *Id.* The trial judge's refusal to declare a mistrial will be disturbed only if that incident, viewed retrospectively, constituted reversible error. *Id.* An error will be deemed harmless if the appellate court is able to declare, beyond a reasonable doubt, that there was no reasonable possibility that the evidence complained of contributed to the conviction. *State v. Barcella*, 135 Idaho 191, 198, 16 P.3d 288, 295 (Ct.App.2000).

During Davis's testimony about his conversations with Huntsman, he mentioned that Huntsman was represented by a public defender. Defense counsel objected, moved to strike, and subsequently moved for a mistrial, citing the court's previous ruling that all references to the fact that Huntsman was represented by a public defender were inadmissible. Huntsman argued that this testimony would prejudice him because it revealed to the jury that he was unable to pay for private counsel. He further contended that merely striking the testimony was inadequate because it would be difficult for the jury to disregard what they had just heard.

The district court held that Davis's testimony violated the court's pretrial ruling, but denied the motion for a mistrial, indicating that it would instruct the jury to disregard the statement, and finding that any prejudice could be remedied by a curative instruction.

Even assuming the testimony was in error and the instruction did not operate to cure that error, we conclude that Huntsman has failed to establish that Davis's statements require a reversal of his conviction. Given the significant body of evidence presented at trial that Huntsman was guilty as charged, we are convinced beyond a reasonable doubt that the evidence of which he complains here did not contribute to his conviction. As pointed out by the state in its brief, the evidence against Huntsman included testimony from the kidnapping victims, one of whom was also an eyewitness to Schmeichel's murder. The individuals whom Huntsman enlisted to help him to help bury the body also testified, as did those to whom Huntsman admitted that he had shot Schmeichel. In sum, in light of the quantity of evidence presented by the state at Huntsman's lengthy trial, we are convinced beyond a reasonable doubt that there is no reasonable possibility that the jury's knowledge that Huntsman was being represented by a public defender contributed to his conviction.

### F. Cumulative Error

 Finally, Huntsman contends that a panoply of errors that occurred before and during trial constituted cumulative error and that, as a result, his conviction should be reversed. The cumulative error doctrine requires reversal of a conviction when there is an accumulation of irregularities, each of which by itself may be harmless, but when aggregated, show the absence of a fair trial in contravention of the defendant's constitutional right to due process. *Dunlap v. State*, 141 Idaho 50, 65–66, 106 P.3d 376, 391–92 (2004). In order to find cumulative error, this Court must conclude there is merit to more than one of the alleged errors and then conclude that these errors, when aggregated, denied the defendant a fair trial. *Id.* at 66, 106 P.3d at 392. In this case, even if we assume the court erred in failing to exclude Hayden and Clampitt's testimony and in refusing to grant Huntsman's motion for a mistrial, together they did not amount to a denial of due process requiring reversal. *See State v. Hill*, 140 Idaho 625, 631, 97 P.3d

1014, 1020 (Ct.App.2004) (applying cumulative error doctrine to assumed error).

## III.

## CONCLUSION

We conclude that since Huntsman did not appeal within the requisite forty-two days after the motion to dismiss was granted in the initial case, we have no jurisdiction to address the claims he asserts regarding that first case. We also will not address whether Huntsman's constitutional speedy trial rights were violated as there was not an adverse ruling on this issue by the district court. Further, the court did not err in refusing to exclude the testimony of two late-disclosed witnesses, and even assuming that Hayden and Clampitt violated the court's pretrial exclusion orders, Huntsman has not made the requisite showing of prejudice that would require the exclusion of their testimony. Finally, Huntsman has not demonstrated that Davis's testimony regarding the fact that Huntsman was being represented by a public defender was a reversible error requiring a mistrial, nor has he made a showing that alleged errors in the trial amounted to cumulative error warranting reversal of his conviction. The judgment of conviction is therefore affirmed.

Judge LANSING and Judge PERRY concur.